UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ APR 24 2015 ★
LONG ISLAND OFFICE

11-CV-1707 (JFB)

ROBERT PLUMMER,

Petitioner,

VERSUS

SUPERINTENDENT WILLIAM T. HAGGETT,

Respondent.

**MEMORANDUM AND ORDER**
April 24, 2015

JOSEPH F. BIANCO, District Judge:

Robert Plummer ("petitioner") petitions this Court *pro se* for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction entered on September 10, 2008, in the Supreme Court of the State of New York, County of Nassau (the "trial court") for course of sexual conduct against a child in the second degree. *See* N.Y. Penal Law § 130.80(1)(a). Petitioner was sentenced to a determinate term of seven years' imprisonment and three years' post-release supervision.

In the instant petition, petitioner seeks a writ of habeas corpus claiming that the trial court deprived him of a fair trial and due process of law by precluding him from introducing the third of a series of out-of-court statements for the purpose of demonstrating that the first two statements, which were admitted at trial, were given involuntarily. Petitioner argues that the trial court's preclusion of this evidence deprived him of a meaningful opportunity to present a complete defense to the crime charged.[1] For the reasons set forth herein, the Court concludes that there is no basis for habeas relief, and denies the petition in its entirety.

I. BACKGROUND

A. Facts

The Court has adduced the following facts from the instant petition and the underlying record.

Petitioner was indicted for, and later convicted of, one count of course of sexual

---

[1] At the outset, the Court notes that the central issue in the instant petition is petitioner's right to present a complete defense to the crime charged. Although factually relevant, the voluntariness of petitioner's confessions is not at issue in the instant petition because, as is discussed *infra*, petitioner does not challenge the trial court's finding that the statements were voluntary and admissible.

1

conduct against a child in the second degree. See N.Y. Penal Law § 130.80(1)(a). Petitioner's conviction arose out of events that took place between 1999 and 2003, during which petitioner sexually abused his niece, R.H.[2], fifteen to twenty times when she was between the ages of six and ten years old. Petitioner's conduct did not come to light until 2006, when R.H.'s mother discovered an old entry in R.H.'s diary, indicating she had been abused by petitioner.

On February 8, 2007, petitioner was arrested and taken to the Nassau County Police Headquarters in Mineola. (Tr.[3] at 953, 956-58.) Following his arrest, petitioner voluntarily waived his *Miranda* rights and gave three successive written statements to the interrogating officers.[4] The first statement ("statement one") was a confession to sexually abusing the victim fifteen to twenty times:

> Between the years 2000 and 2003 . . . I want to admit that, over the years when [R.H.] was between the ages of 6 through 10, I did sexually abuse her. I admit I did it. There were about 15 to 20 times that I touched her and rubbed myself on her. I didn't penetrate her vagina with my fingers, but I did rub her vagina area. There was one time when I put my mouth on her vagina and kissed her vagina. I am very sorry for what I did. . . . I am now at Special Victims Squad giving the statement to Detective Moran freely and voluntarily. I did read it. It is my words and it is the truth.

(Resp. Ex. 17.)

The second statement ("statement two") was a handwritten letter of apology to the victim, in which petitioner apologized to the victim for his conduct:

> Dear [R.H.], I am writing this letter to you to try and explain what I had done to you. I know there really is no way for me to make this up to you but I'll try. Please try to forgive me because I'm really sorry. I know that it's no excuse, but when I did those things to you, I was on drugs, and for some reason I was unable to control myself. Again, I know that this is no real reason or excuse for what I did. But again, I'm sorry. You know that I love you and would never do anything to hurt you. I hope that one day you will be able to forgive me. If not, I'll understand. Always, Robert.

(Resp. Ex. 17.)

The third statement ("statement three") was a confession to sexually abusing another individual, the victim's cousin. Petitioner was not charged with sexually abusing the victim's cousin, and his confessed abuse was not at issue during petitioner's trial. At no point during the trial was the jury made aware of the existence of statement three. However, at the trial, statements one and two were admitted into evidence.[5]

---

[2] In the interest of maintaining the privacy of a minor, the Court will refer to the victim as "R.H."

[3] "Tr." refers to the transcript of petitioner's trial.

[4] Although arrested on February 8, 2007, petitioner gave his statements after 12:00 a.m. that evening, and thus all three statements were dated February 9, 2007.

[5] In addition to statements one and two, the prosecution offered other evidence at trial to establish petitioner's guilt of the abuse charge.

2

## B. Procedural History

### 1. State Court Proceedings

#### a. *Huntley* Hearing

On January 3, 2008, the Honorable Joseph C. Calabrese held a *Huntley* hearing to determine whether the three written statements made by petitioner at the Nassau County Police Headquarters were voluntarily and intelligently made. (PTR.[6] at 3.)

At the hearing, Detectives Edmond Moran and James Crawford testified as to the events surrounding petitioner's arrest and interrogation. (*Id.* at 10-37, 83-90.) At issue was petitioner's state of mind during the time he was in police custody and whether any promises were made to petitioner in return for a confession. The officers were also questioned about whether petitioner was informed of his *Miranda* rights and, if so, whether he was informed before or after any statements were made. The officers testified that no threats or promises were made to induce petitioner to confess. (*Id.* at 30, 89.) Moran testified that petitioner was advised of his *Miranda* rights, and that petitioner knowingly waived his rights before offering his first statement. (*Id.* at 21-22.) Moran further testified that petitioner's second and third statements contained *Miranda* warnings, and that petitioner read the statements before signing them. (*Id.* at 30, 32.)

By Decision and Order dated January 17, 2008 and entered on January 23, 2008, the trial court held that all three statements made by petitioner were voluntarily and intelligently made.

---

[6] "PTR." refers to the transcript of petitioner's *Huntley* hearing.

#### b. Trial and Sentencing

On February 8, 2007, petitioner was indicted on one count of course of sexual conduct against a child in the second degree in violation of Penal Law § 130.80(1)(a). (Nassau County Indictment Number 2180N-07.)

The following details of petitioner's trial are relevant to the instant petition. Prior to trial, counsel for petitioner informed the court that he intended to introduce statement three into evidence. (Tr. at 6.) Counsel explained that petitioner had learned that the victim's cousin had denied ever being sexually abused by petitioner. (*Id.* at 10-12.) According to petitioner, this would demonstrate that petitioner "would have signed anything that night," and that his will was overborne at the time he signed statements one and two, in which he confessed to sexually abusing the victim. (*Id.* at 10, 13-14.) However, counsel stated that petitioner was not going to bring in the victim's cousin to testify that the sexual abuse did not happen. (*Id.* at 17.) The trial court refused to allow statement three into evidence, finding that it was irrelevant and self-serving hearsay. (*Id.* at 9-16.) Petitioner maintained his objection to the court's ruling and preserved the matter for review on appeal.

At trial, petitioner maintained his innocence of the crime charged and sought to establish that his confessions were involuntarily obtained and, thus, unreliable.

On direct examination, petitioner testified to the following. After arriving at the police station, two plainclothes officers took petitioner to a room, which contained a desk and three chairs. (*Id.* at 958.) The officers placed petitioner in a chair and stood there for approximately ten minutes. (*Id.*) At this point, Moran and Detective

3

Edwin Trujillo entered the room, removed petitioner's existing handcuffs, and, using their own handcuffs, handcuffed petitioner to the chair. (*Id.*) Trujillo then began to interrogate petitioner. "He was asking me if I sexually abused my niece. He asked me if I had sex with my niece. He asked me if I inserted my fingers into her vagina. He asked me if I ever fondled her. He asked me if I ever touched her in an inappropriate manner, if I kissed her in an inappropriate manner." (*Id.*) Petitioner responded, "Absolutely not." (*Id.* at 959.) Although petitioner did not have access to a clock, he believed the interrogation lasted "a couple of hours."[7] (*Id.*)

Counsel then showed petitioner statement one and the accompanying *Miranda* rights card. Petitioner testified that he signed the rights card, and that he signed it after he signed the written statement. (*Id.* at 959-61.) When asked why he signed the statement, petitioner testified that at first he refused to confess to the crime. (*Id.* at 962.) Once the detectives told him that the only alternative was "to sit in jail until this thing comes to trial," petitioner came to think that confessing was his best option in the hope that the detectives would fulfill their promise and he would get released from jail and not lose his job. (*Id.*)

Petitioner then explained in detail to the jury the process of how his first statement was produced. The detectives questioned petitioner and Moran typed petitioner's answers into a computer as he spoke. At some point, the detectives stopped and said, "If you are going to give a confession, it has to be specific." (*Id.* at 964.) Petitioner then told the detectives, "I laid on her. I rubbed my groin on her . . . I touched her vagina . . . I put my mouth on her vagina." (*Id.*) Petitioner then told them that he did this "fifteen to twenty times." (*Id.*) While Moran was typing out the confession, Trujillo said, "Okay, listen if you really want to get sympathy from the judge . . . you need to write an apology letter to [R.H.]." (*Id.* at 965.) Petitioner did not want to write the apology letter; he agreed to write it after Trujillo said, "If you want to get sympathy from the judge, you have to show that you are remorseful." (*Id.* at 965-66.) Petitioner wrote the apology letter by hand. (*Id.* at 966.) He stated that he tried to make the letter vague, but also tried to satisfy the detectives. (*Id.*)

Counsel then asked petitioner why he signed the statement and wrote the apology letter. Petitioner, again, explained that he confessed because he "believed the detectives when they stated to me that they would speak on my behalf and try to get me released." (*Id.* at 967.) Petitioner did not testify that the officers mistreated him or subjected him to any direct form of coercion.

On May 22, 2008, the jury found petitioner guilty of the aforementioned charge. (*Id.* at 1365, 1371). Petitioner was sentenced on August 28, 2008 to a determinate sentence of seven years' imprisonment. (8/28/08 Sent. Tr.[8] at 13.) On September 10, 2008, petitioner's prior sentence was vacated and he was resentenced to a determinate term of seven years' imprisonment and three years' post-release supervision. (9/10/08 Sent. Tr.[9] at 4.)

---

[7] On cross-examination, petitioner testified that the interrogation lasted between two to three hours. (*Id.* at 1050.)

[8] "8/28/08 Sent. Tr." refers to the transcript of the petitioner's sentencing proceeding, which took place on August 28, 2008.

[9] "9/10/08 Sent. Tr." refers to the transcript of the petitioner's resentencing proceeding, which took place on September 10, 2008.

4

Petitioner was resentenced because the trial judge failed to impose a period of post-release supervision, which is required by law. (*Id.* at 2.)

### c. Direct Appeal

Petitioner appealed his conviction to the New York Supreme Court, Appellate Division, Second Department ("Appellate Division"), on the following grounds: (1) the trial court deprived petitioner of a fair trial by precluding the defense from introducing evidence showing petitioner's will was over-born and his statements were involuntary; (2) the evidence was legally insufficient and the jury's verdict was against the weight of the evidence; and (3) the sentence imposed was unduly harsh and excessive. (Def.-Appellant Br. at 35, 39, 45.)

On October 5, 2010, the Appellate Division unanimously affirmed the trial court's ruling. *People v. Plummer*, 77 A.D.3d 688 (2d Dept. 2010). The court held: (1) petitioner's claim with respect to the trial court's preclusion of his out-of-court statement was without merit; (2) the evidence was legally sufficient to establish petitioner's guilt beyond a reasonable doubt and the verdict was not against the weight of the evidence; and (3) the sentence imposed was not excessive. *Id.*

Petitioner then filed an application with the New York Court of Appeals for leave to appeal the Appellate Division's order. Petitioner renewed his arguments with respect to the legal sufficiency of the evidence and the trial court's preclusion of his out-of-court statement. The New York Court of Appeals denied petitioner's application for leave to appeal on December 3, 2010. *People v. Plummer*, 15 N.Y.3d 955 (2010). Petitioner did not petition the United States Supreme Court for a writ of certiorari.

### 2. The Instant Petition

Petitioner filed the instant habeas corpus petition together with his *pro se* brief in support of the petition on April 4, 2011. Petitioner claims that the trial court deprived him of a fair trial and due process of law by precluding him from introducing into evidence his third statement of admission, and that the court's preclusion of this evidence deprived petitioner of a meaningful opportunity to present a complete defense to the crime charged. Respondent filed a memorandum of law in opposition to the petition on July 6, 2011. Petitioner filed a reply to respondent's opposition on August 15, 2011. The Court has fully considered the arguments and submissions of the parties.

## II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

5

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'Clearly established Federal law'" is comprised of "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). Additionally, while "'[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact . . . are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

III. DISCUSSION

A. Right to Present a Complete Defense

Petitioner argues that the trial court's preclusion of statement three deprived him of his right to a fair trial and to due process of law under the Sixth and Fourteenth Amendments. However, "[t]he power of courts to exclude evidence through the application of evidentiary rules that serve the interests of fairness and reliability is well-settled." *Wade v. Mantello*, 333 F.3d 51, 58 (2d Cir. 2003). Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner "can show that the error deprived [him] of a *fundamentally fair* trial." *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) (internal quotation marks omitted) (emphasis supplied).

In determining whether a state court's alleged evidentiary error deprived a petitioner of a fair trial, federal habeas courts engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under state law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. *See Taylor v. Connelly*, 14-CV-612 (ADS), 2014 WL 1814153, at *9 (E.D.N.Y. May 7, 2014) (citing *Wade*, 333 F.3d at 59 n. 7). The test for "fundamental fairness" is whether the

6

excluded evidence, "'evaluated in the context of the entire record, create[d] a reasonable doubt [regarding petitioner's guilt] that did not otherwise exist.'" *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983) (quoting *United States v. Agurs*, 427 U.S. 97, 112-13 (1976)).

In abundance of caution, the Court will proceed directly to the question of whether any possible error concerning the admission of statement three under state law[10] resulted in a fundamentally unfair trial or deprived petitioner of a meaningful opportunity to present a complete defense to the crime charged. Ultimately, having reviewed the entire record, the Court concludes that the preclusion of statement three does not rise to the level of a constitutional violation because the excluded evidence would not have created a reasonable doubt as to petitioner's guilt that did not otherwise exist.

To be clear, the constitutional right at issue is petitioner's right to present a complete defense to the crime charged, and more specifically, to defend himself by presenting evidence about the circumstances surrounding his confession. As properly recognized in petitioner's brief, the strongest source of clearly established federal law relevant to petitioner's claim is the decision of the Supreme Court in *Crane v. Kentucky*, 476 U.S. 683 (1986).

In *Crane*, the Supreme Court reaffirmed the general principle that criminal defendants have a "fundamental constitutional right to a fair opportunity to present a defense." *Crane*, 476 U.S. at 687 (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Specifically, the Court held that refusing to allow a defendant to present evidence concerning the circumstances of his interrogation and confession, after the trial judge had ruled that the confession was voluntary, deprived the defendant of his Sixth and Fourteenth Amendment rights. *Id.* at 691.

The Court explained that, if the defendant is "stripped of the power to describe to the jury the circumstances that prompted his confession, [he] is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" *Id.* at 689. Consequently, the Court concluded that where the prosecutor's case is based on the defendant's confession, the defense must be permitted to explore the circumstances under which the confession was obtained. *Id.*

B. Analysis

At the outset, the Court notes that *Crane* involved the blanket exclusion of any testimony about the circumstances of the confession at issue. *See* 476 U.S. at 690. Petitioner's case, in contrast, involves "one of those ordinary evidentiary rulings by state trial courts concerning the admissibility of evidence, upon which the Court is traditional[ly] reluctan[t] to impose constitutional constraints." *Wade*, 333 F.3d at 60 (internal quotation marks and citations omitted). The *Crane* Court itself recognized

---

[10] This is not to suggest that the trial court's preclusion of statement three was erroneous under New York law. As is suggested by the Court's conclusion *infra* that statement three would not have created a reasonable doubt in petitioner's trial, this Court also considers petitioner's self-serving claim—that statement three (regarding a different victim) also was coerced—to be irrelevant to the charges involving R.H. Such a claim would only have relevance if additional evidence was going to be submitted to undermine statement three, which petitioner did not intend to do. Moreover, any probative value also could have been substantially outweighed by a danger of confusion of the issues by a jury regarding a mini-trial about the victim's cousin. In any event, even assuming *arguendo* there was error, it did not deny petitioner a fundamentally fair trial.

7

that, short of a blanket exclusion, trial courts retain "'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant,' or poses an undue risk of . . . 'confusion of the issues.'" *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

Here, it is clear from the record that petitioner was afforded the opportunity to testify, and his counsel cross-examined the detectives concerning the conditions under which petitioner made statements one and two. Relevant circumstances concerning the voluntariness of statements one and two include: (1) the conduct of the law enforcement officers, (2) the conditions of the interrogation, and (3) the background of the accused. *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir. 1988). With regards to the conduct of the officers, "facts bearing on that conduct include the repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights . . . whether there was physical mistreatment . . . or long restraint in handcuffs, and whether other physical deprivations occurred. . . . In addition . . . such police conduct might include psychologically coercive techniques such as brainwashing or promises of leniency or other benefits." *Id.*

Much of the evidence in the record concerning the conduct of the officers emerged from petitioner's own testimony. He testified that, after arriving at the police station, two plainclothes officers took him to a room, which contained a desk and three chairs. (*Id.* at 958.) When Moran and Trujillo entered the room, they handcuffed petitioner to a chair. (*Id.*) Trujillo then began to interrogate petitioner, and the jury was able to evaluate whether Trujillo's conduct was psychologically coercive. Petitioner testified to the following. "He was asking me if I sexually abused my niece. He asked me if I had sex with my niece. He asked me if I inserted my fingers into her vagina. He asked me if I ever fondled her. He asked me if I ever touched her in an inappropriate manner, if I kissed her in an inappropriate manner." (*Id.*) Petitioner further testified that, at first, petitioner refused to confess. (*Id.* at 959.) However, according to petitioner, once the detectives told him that the only alternative was "to sit in jail until this thing comes to trial," petitioner testified that he believed confessing was his best option in the hope that the detectives would fulfill their promise and he would get released from jail and not lose his job. (*Id.* at 962.)

Petitioner also testified that the officers told him that if he was going to give a confession, it needed to be specific. (*Id.* at 964.) Petitioner testified that, after he confessed, Trujillo suggested he write an apology letter to the victim "if he really want[ed] to get sympathy from the judge." (*Id.* at 965.) Petitioner asserted that he agreed and hand wrote a letter of apology to the victim. (*Id.*) At trial, counsel asked petitioner why he signed the statement and wrote the apology letter. Petitioner again explained that he confessed because he "believed the detectives when they stated to me that they would speak on my behalf and try to get me released." (*Id.* at 967.) This was the extent of the coercion described by petitioner. He did not allege any form of physical mistreatment or deprivation (*id.* at 1095),[11] and he estimated that the interrogation lasted only two to three hours (*id.* at 1050).

---

[11] On direct examination, Moran added that neither Moran nor Trujillo was armed when Moran began questioning petitioner (*id.* at 636), and that petitioner did not make any complaints, physical or nonphysical, during the interrogation (*id.* at 650-51).

8

Petitioner's counsel elicited other facts concerning the interrogation when he cross-examined the detectives. Although none of these facts were sufficient to exclude petitioner's statement as a matter of law, the jury was permitted to consider that when Moran first encountered petitioner, he was (1) not read his *Miranda* rights immediately upon arrest,[12] (2) in handcuffs, and (3) not free to go. (*Id.* at 688.) Counsel further elicited the fact that petitioner did not ask to write an apology letter to the victim, but that one of the officers suggested the idea to petitioner, and that it is not normal routine to take an apology letter from a suspect. (*Id.* at 720.)

Thus, the totality of the circumstances indicates that petitioner was able to develop a thorough record concerning his two-to-three-hour interrogation, and the trial court's exclusion of statement three hardly rises to the level of the "blanket exclusion" of evidence that the Supreme Court confronted in *Crane*.

Because this petition does not involve a blanket exclusion, the question is whether statement three could have created a reasonable doubt as to petitioner's guilt that did not otherwise exist, such that its exclusion was beyond the trial court's "wide latitude" to find it irrelevant under state law. *Wade*, 333 F.3d at 60. As noted, statement three was not offered for the truth of its contents, but instead as evidence that petitioner's confession was involuntary, and that therefore the jury should consider it, and the other post-arrest statements, unreliable. For several reasons, this argument does not raise the exclusion of statement three to the level of a constitutional error.

To begin with, there is no constitutional requirement that courts admit every word of every statement made by a defendant in the course of his interrogation; instead, it is erroneous to exclude a portion of a defendant's statement only if that portion is necessary to explain the admitted portion, place it in context, or avoid misleading the jury. *See, e.g., United States v. Laster*, 313 F. App'x 369, 371-72 (2d Cir. 2009). Petitioner has not shown that statement three itself explains anything about the contents of statements one and two, or that the jury was misled as to the substance of petitioner's confession in the absence of statement three. Thus, on its face, statement three does not create a reasonable doubt about petitioner's other confessions or his overall guilt that would not have otherwise existed.

Instead, petitioner argues that the purported falsity of statement three demonstrates that statements one and two were coerced. Thus, petitioner's argument goes beyond the face of statement three, and requires the additional logical link that the victim's cousin had since denied being abused, even though she never testified as such and petitioner's counsel did not plan to call her as a witness. Thus, the only circumstance that could render statement three even marginally relevant would have been the petitioner's self-serving testimony that statement three was also false (regarding the victim's cousin), the exclusion of which did not affect the fundamental fairness of petitioner's trial. *Cf. Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) (denying petition alleging improper exclusion of witness' hearsay testimony where declarant had motive to fabricate and petitioner declined opportunity to properly admit statement). In other words, if the jury did not believe petitioner's

---

[12] On cross-examination, however, petitioner acknowledged that Trujillo had read him *Miranda* warnings when petitioner first arrived at the police station, before Trujillo began asking petitioner questions pertaining to the allegation, and thus before petitioner confessed. (*Id.* at 1068-71.)

9

testimony that statements one and two were coerced, the jury would have had no additional basis to conclude the third statement was coerced as well.

In sum, (1) statement three had no value in and of itself, (2) there was no indication that the victim's cousin would have testified to offer evidence of the statement's falsity, (3) questioning the detective about his interview of the victim's cousin would have been improper[13], and (4) petitioner's self-serving testimony as to the falsity of statement three would have been duplicative of his denials as to statements one and two. For these reasons, the Court concludes that statement three would not have created a reasonable doubt that did not otherwise exist, and its exclusion did not result in a fundamentally unfair trial.

IV. CONCLUSION

Petitioner has failed to point to any state court ruling that was contrary to, or an unreasonable application of, clearly established federal law, or that resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Thus, he has demonstrated no basis for habeas relief under 28 U.S.C. § 2254, and the Court finds this petition to be without merit. Therefore, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

Joseph F. Bianco
United States District Judge

Dated: April 24, 2015
Central Islip, New York

\* \* \*

Petitioner proceeds *pro se*. Respondent is represented by Kathleen M. Rice, District Attorney, Nassau County, by Joanna Hershey, 262 Old Country Road, Mineola, NY 11501.

---

[13] *See Alvarez v. Ercole*, No. 09 Civ. 2696 (CM), 2013 U.S. Dist. LEXIS 99964, at *15 (S.D.N.Y. July 12, 2013) (in a habeas case, defense counsel had sought, as a sanction at trial in state court, permission to elicit testimony from interviewing detectives about the contents of their witness interviews, which were otherwise hearsay).